# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1873.

---

RUCKMAN *vs.* DECKER and others.

1. An agreement by R. to join with W. in the business of planting and selling oysters, by which R. was to find the capital and W. to go to Virginia and plant and buy oysters, to be sent to R. in his vessels to New York for sale, each to have one-half of the net profits, is a partnership.

2. On the termination of such partnership, planted oysters remaining in the beds after payment of all partnership debts, are the common property of both partners, of which, as in case of any personal property held in common, one tenant in common cannot dispose of the share of the other without his authority.

3. If such tenant in common turn over such property to a firm of which he becomes a member, such firm is accountable to the other tenant in common of the property, for the value of his share of the property so turned over and used by the new firm.

4. The purchase of the property of one man from another who is in possession of it, without authority from the true owner to sell it, will not change the title, nor protect such purchaser against the true owner. The doctrine of equity, which protects a *bona fide* purchaser without notice, only applies to a purchaser of the legal title, without notice of the equitable title of a third person. And in such case notice to one partner would be held as notice to the firm.

5. In equity, the defence of the statute of limitations may be set up by plea, answer, or demurrer; but if not set up in any way in the pleadings it cannot avail.

6. The admissions of one partner are evidence against the others, in a suit brought against all for partnership liabilities.

---

Argued on final hearing, upon pleadings and proofs.

*Mr. J. B. Vredenburgh* and *Mr. J. Weart,* for complainant.

*Mr. B. Gummere,* for defendants.

THE CHANCELLOR.

The complainant brings his suit against Benjamin Decker and William Decker, and Basil W. Wilson, for an account. The two Deckers have answered; Wilson has not. Wilson died, pending the suit, in October, 1870, and the suit is continued against the Deckers, as survivors. The complainant, for some years prior to April, 1857, was engaged in the business of importing and selling oysters in the city of New York; a business conducted on scows moored to the wharves, in which oysters are received, and from which they are sold. The oysters are obtained by sending vessels to the south—principally to Virginia—where the oysters are sometimes taken from beds in which they have been planted for the oyster-dealer, and sometimes are purchased from vessels which come alongside, offering them for sale. Sometimes the oysters so purchased are dumped or thrown overboard upon a reef or bar, overflowed by tide-water, so as to be preserved until a full cargo is gathered for a vessel to New York. The complainant relinquished the business of an oyster-dealer in April, 1857, and since then has resided at Closter, in the county of Bergen. The defendants, B. and W. Decker, are, and have been for more than twenty years, oyster-dealers in the city of New York, their place of business there being in the vicinity of that formerly occupied by the complainant.

The complainant, in 1851, entered into an agreement with Wilson, that Wilson should go to Virginia and purchase oysters to be shipped for New York, and plant oysters on oyster-beds in the waters of Virginia, and send them, when in fit state, to the complainant in New York. The complainant was to furnish all the money needed for the business, and to sell the oysters, and Wilson to give his time and attention

to it ; the profits, after payment of all advances and expenses, were to be equally divided between the complainant and Wilson. Wilson, in pursuance of this agreement, went to Virginia, and rented of Henry Phillips a tract of land fit for planting oysters, in the Nansemond river, in front of Phillips' farm, situate on the west side of the river, in Nansemond county. In January, 1853, Wilson purchased of Phillips this farm, containing one hundred and seventy acres, for $2500, the money being furnished by the complainant, and the deed taken in the name of Wilson, on the supposition that, as Ruckman was a non-resident, he would not be allowed to carry on the business there, because the laws of Virginia prohibit the taking of oysters by non-residents. Afterwards, in 1856, Wilson gave the complainant a writing, by which he acknowledged the right of complainant to one-half of this farm thus bought with his money ; and in 1869 a conveyance of that half was obtained by the complainant through a decree of this court. In front of this farm, on the Nansemond river, was a tract of flats of about eighty acres, fit for planting oysters. There does not appear to be any law in Virginia giving to the riparian owner any exclusive right to plant oysters in the flats under tide-waters in front of his lands below low-water mark. But the custom seems to be to concede this to him, and by the law of the state, any one who stakes out and plants an oyster-bed, is protected in his property.

Wilson, under the agreement with the complainant, and with funds furnished by him from and before 1853, and until and in 1857, planted oysters on these flats, and from time to time shipped oysters from them to the complainant in New York.

In 1856, Wilson told B. and W. Decker that he was dissatisfied with the conduct of the complainant, and would terminate his connection with him, and offered to undertake planting and purchasing oysters for them in Virginia, on the same terms as he had done with the complainant. The Deckers made an arrangement with him on the same terms as that between him and the complainant. In May, 1856, the

Deckers began to advance money to Wilson under this arrangement, and furnished him large sums of money, exceeding $50,000, until the arrangement was discontinued in 1867. Wilson planted oysters under this arrangement at Ferry Point, in the Nansemond river, or a place about five miles above the Phillips farm; and after 1858, planted some on the flats in front of the Phillips farm, which I shall call the Wilson bed. Wilson sent oysters to the Deckers from Virginia from 1856 to 1867, with some intermission during the four years of the war. During the whole time many of these oysters were loaded on the vessels from the Wilson beds. After April, 1857, Wilson did not send any oysters to the complainant, but in 1858 sent to B. and W. Decker four cargoes of oysters, as the property of Ruckman and Wilson, to be sold on their account. This consignment was known to the complainant, who sanctioned it by receiving part of the proceeds of the sales from B. and W. Decker. The amount of these sales has never been fully paid over. B. and W. Decker acknowledge that they owe a balance of about $70, while the complainant claims a much larger sum.

The complainant charges and claims that when Wilson ceased sending oysters to him, there was, on the Wilson bed in front of the Phillips farm, a large amount of oysters of the value of $40,000 and upwards; and that these, after the termination of the partnership, or the business of sending them to New York to sell, belonged to him and Wilson, as tenants in common; that they were the proceeds of the partnership business and represented the profits, and were to be equally divided; that Wilson sent these oysters to B. and W. Decker, under his arrangement with them, and by them they were received and sold for the benefit of the partnership existing between Wilson and them; and he asks that they shall account to him for his share of these oysters thus appropriated. He claims that he and Wilson owned the flats in front of the Phillips farm, and that the firm of Wilson and Decker shall account to him for the value of his half of these

flats, used by them for the planting of oysters since those planted for him were taken off.

The Deckers, in their answer, say that neither of them was ever down at the Nansemond river, and state, from information and belief, that the oysters sent to them by Wilson were not the oysters planted there by Wilson for the complainant, and that none were sent from the flats in front of the Phillips farm, except oysters planted there by Wilson for them after the oysters of Ruckman and Wilson had been cleaned up, and oysters temporarily dumped there for them. They deny that any oysters planted there for them by Wilson caused any injury to the complainant. They admit that in 1858, the four cargoes of oysters mentioned above were consigned by Wilson to them for sale, and insist that they have accounted fully for them to both Ruckman and Wilson, except a small balance.

Before I proceed to consider the evidence, I will dispose of some preliminary questions of law.

In the first place, it is clear that the arrangement made between Ruckman and Wilson, and that between the Deckers and Wilson, created a partnership in each case. It provided for the carrying on of the business by one party contributing capital, and the other skill and labor; and that each should have an equal share of the profits and bear an equal share of loss. This constitutes a partnership.

In the second place, the defendants contend that they cannot be called upon to account in this court; that if they have taken and appropriated the complainant's property, or occupied his land, his remedy is at law, by action of trespass or trover, or for money had and received for the oysters sold, and by action for the use and occupation of the oyster bed.

But the charge is that Wilson, while a partner with complainant, or after the termination of the partnership, while in possession of the effects of the late partnership belonging to both as tenants in common, in the absence and without the knowledge of the complainant, secretly and fraudulently turned over this property to another firm, of which he was a

member, without either rendering or keeping an account of the quantity and value so turned over. One tenant in common can maintain a suit in equity against his co-tenant, and although the rule is more generally applied to tenants in common of real estate, it is not confined to them. And in a case where the charge is that the property was fraudulently and secretly converted by the tenant in common, and a discovery is necessary for ascertaining the amount and extent of the wrong, a suit in equity will be maintained. No other remedy is adequate. And where the tenant in common, as in this case, has turned over the property to a firm of which he is a member, and the firm has received the benefit of the property, the suit can be maintained against them all. They having used and appropriated the complainant's property without his consent and without payment, are bound to make compensation. Wilson had no power to sell the complainant's half of these oysters. *Story on Part.*, §§ 333, 346; *Buckley* v. *Barber*, 1 *Eng. L. & Eq. R.* 511; *Fox* v. *Hanbury*, *Cowp.* 445, 449; *Hague* v. *Rolleston*, 4 *Burr.* 2174; *Phillips* v. *Reeder*, 3 *C. E. Green* 99. And even if they had paid him in full, the true owner, as in all other unauthorized sales of personal property, can recover of the firm the property or its value.

In the third place, the Deckers contend that as they did not know that the oysters sent to them by Wilson were in whole or in part the complainant's property, or planted on land belonging to him, and as they have paid Wilson for them in good faith on their settlement with him, they should not be held liable to the complainant. If we concede that the Deckers, by their answer and evidence, have established that they acted in entire good faith, and had no knowledge or suspicion that any of the oysters sent them by Wilson belonged to Ruckman, that is no defence in this action. The legal owner of any chattels cannot be deprived of his property by a sale not authorized by him, although the purchaser acted in entire good faith, and the vendor was in possession of the property seemingly as if his own. An agistor of cattle, or a

livery-stable keeper, cannot give good title to cattle or horses left with him; nor would a sale by a jeweller of a diamond necklace left by a customer for repair, pass the title, though the purchaser bought and paid for it in good faith, while exhibited in the show-case with the jewelry of the vendor. The peculiar doctrine of equity as to a *bona fide* purchaser without notice, is only applied in cases where it protects the legal title as against an equity of which the purchaser of the legal title had no notice. Again, the three defendants in this case are partners, and are sued as such; they were partners at the time of the alleged taking of these oysters. The doctrine of partnership applies to them, and by that doctrine notice to one partner is notice to all; and if Wilson knew at that time that these oysters were in part the complainant's, his knowledge was that of the firm. He may have defrauded his partners; it is probable that he did. Yet the severe but necessary law of partnership makes them liable for his acts and knowledge.

In the fifth place, it is contended that the complainant's remedy is barred by time; that courts of equity adopt the limitations prescribed for the courts of law, and besides this discourage laches, by refusing to entertain suits where the delay has been unreasonable. The limitation for actions of account is six years, and all the claims for matters before 1863 will be shut out, if the statute could be taken advantage of in this suit; but the statute has not been pleaded or set up in the answer as a defence. In suits at law this defence must be pleaded. In equity it may be taken advantage of by plea. *Story's Eq. Pl.*, §§ 751, 759. Or where the facts appear in the bill, by demurrer. *Story's Eq. Pl.*, § 503. Or it may be set up in the answer. *Story's Eq. Pl.*, §§ 503, 751, 847; *Piatt* v. *Vattier*, 9 *Pet.* 405; *Van Hook* v. *Whitlock*, 7 *Paige* 373; *Boone* v. *Chiles*, 10 *Pet.* 177.

But there is no authority holding that it can be taken advantage of without being somewhere set up as a defence. The reasoning in all the cases implies that it must be expressly set up. It would be unfair to allow it, unless set up

in the pleading. In many cases the complainant could have replied when special replications were allowed any of the exceptions to the plea, and could now set them up by the substituted practice of amending his bill for the purpose. And he could then produce proof of the exception. The evidence in this case does not support the defence. The defendant, Wilson, lived in Virginia until 1866. The two Deckers did business in New York, and must be presumed to have resided there until 1867, when it first appears that both resided in New Jersey. There may be a presumption of law that a residence once obtained continues until a change is shown. But there is no presumption that a person shown to have resided in Hoboken in 1867, resided there for six years before. Outside of the statute of limitations there is no laches not explained by the circumstances of the case.

The consignment made by Wilson to the Deckers of four cargoes of oysters in 1858, cannot come in question here. It was assented to by Ruckman, and it was thus, in fact, a sale by Ruckman and Wilson of their own oysters to B. and W. Decker. The claim is by Ruckman and Wilson against B. and W. Decker, and cannot be brought forward in a suit in which Wilson, who is entitled to half of it, is a defendant.

The admissions of Wilson, made while he was a partner with the Deckers, are admissible here, both because the admissions of one partner are evidence against the firm, and because he is a defendant in the suit for matters done by him jointly with the other defendants, who are shown to have been acting with him by receiving and selling the oysters.

I will not consider the testimony given by a large number of witnesses on both sides, as to the character of Ruckman for truth and veracity. The conclusions at which I have arrived are based almost wholly on other testimony. The chief importance of his testimony was in showing the knowledge of his interest by the Deckers, which, in the view I have taken, is of no consequence; and the other evidence given by him of admissions and conversations—evidence never to be much re-

lied on—is of little weight, when resting upon the sole testimony of a party in the cause.

The main question is as to the weight and effect of the evidence. The complainant has the burden of proof; he is bound to show that the oysters sent by Wilson to the Deckers were the oysters planted by Wilson for him, or oysters planted on the Wilson bed, while any of his oysters of appreciable value remained there. The law of Virginia protects the owners of oysters planted on such beds in their property; (*Code of* 1849, *p.* 453, § 23;) and while it prohibits non-residents from taking oysters in the waters of the state, it declares that, for the purpose of that enactment, the owner of lands on or adjoining any tide-water course, shall not be considered a non-resident. *Code of* 1849, *p.* 730, § 23. The complainant was within the protection of that law; and therefore, when any one put his oysters on the bed of the complainant, as they could not be distinguished, they became his by the doctrine of confusion of goods.

The evidence, in my opinion, establishes the fact that Wilson planted no oysters on this bed for Ruckman after 1857, and that some were planted in that year. Wilson's letter of June 24th, 1857, and his receipts of June 10th, and July 7th of that year, are sufficient as against him to sustain that conclusion. Wilson planted few or none on this bed for the Deckers, prior to 1859. He began planting for them in 1856, and planted largely for them at Ferry Point, about five miles above this bed, in the same river.

There is evidence on part of the defendants, that this bed was cleaned up in 1857 and 1858, by Wilson, and the oysters placed upon a reef or bar in it, from which they were taken to New York, being the four cargoes taken there in 1858. But the bed was large, about eighty acres, all under water at ordinary low tide. It was staked off in parcels by four hundred stakes, which may have marked off over one hundred beds, and the witnesses may have cleaned off the beds on which they worked, while others were untouched. It is otherwise impossible to reconcile their testimony with that of a

large number of witnesses who say that in 1858, 1859, and 1860, they took from these flats cargoes of oysters, of which many were old oysters, over one and two years old. If none were planted there for the Deckers until 1859, these oysters must have been those planted for Ruckman; and although oysters of one year old taken in 1860, may have been those planted in 1859, yet where these were mixed with oysters of two years old, as in most cases they were, they must have been from the Ruckman beds, on which oysters were planted in 1859 for the Deckers, and which became Ruckman's by confusion of mixture. Wilson's letter to Ruckman, of December, 1858, shows that there were oysters of Ruckman and Wilson then on this bed that needed care, and which he proposed to dispose of in the spring of 1859. This fact is inconsistent with the entire cleaning up in 1858.

The great weight of the testimony of practical oystermen shows that after oysters have been planted for four or five years on ground like most of this bed, they perish or disappear. And as no oysters were planted on this bed for Ruckman after 1857, and comparatively few in that year, I will assume that all the oysters in which he had any interest disappeared after 1860, and shall confine myself to the consideration of the evidence up to and including that year only, to ascertain what oysters were taken that must be accounted for to Ruckman.

The witnesses who testify to taking oysters for the defendants from these grounds in 1858, 1859, and 1860, do not expressly say that the oysters taken by them were planted oysters, and not oysters dumped or gathered there for sale. But these witnesses are old oystermen; they show that they knew of the claim that the oysters planted on these beds in front of the Phillips house were planted for Ruckman, and that those planted on Ferry Point were for the Deckers; and when speaking of and distinguishing the cargoes taken from each of these places, they could not have failed to point out that the oysters were taken from heaps deposited for loading vessels, and not from the beds in which they were planted. It

must be assumed, from the whole of their testimony, that they took the oysters from beds in which they were planted. If it had been from heaps dumped for loading vessels, it should have been shown by the defendants.

It is my duty to decide the merits of the cause upon the evidence. That cannot be referred to a master, but only to ascertain quantities and prices, and from them to compute values. The Chancellor must decide whether it is established by proof that any oysters of Ruckman were taken, and by whom, or what vessel, and then refer it to a master to compute the values of such cargoes as he is satisfied were taken.

I shall assume that all oysters taken from the Wilson beds in 1858, all of one year old taken in 1859, and all of two years old, or mixed with those of two years old, taken in 1860, belonged to Ruckman and Wilson.

Captain Skidmore W. Pettit, with his schooner "Caroline Coles," in the winter of 1858–9, brought five cargoes for the Deckers from Virginia. One-half of these were loaded from the Wilson beds, planted for Ruckman ; and these were old oysters, planted from four to five years. His cargo was two thousand bushels. Captain Peter W. Roff, with his vessel, the "Butler," in the winter of 1857–8, brought five or six cargoes from Virginia. Part of most of these cargoes were taken from this bed, and the whole of some of them. These oysters had been planted a year and upwards. The evidence as to the quantity from this bed, is not very definite, but it must be inferred from it that a quantity equal to one-half of five cargoes of two thousand bushels each was taken. The next season he was pilot on the "Aiken," and she brought from this bed five cargoes of four thousand bushels each. The third season, or 1859–60, he brought, in the "Julia Decker" and "Aiken," from this bed, three cargoes of four thousand bushels each. Roff testifies to a great number of cargoes taken from this bed, but part of them were in 1861. Captain Joline, of the "Butler," which he then commanded, in the winter of 1859, brought for the Deckers a cargo of sixteen hundred bushels, of which one-half were

taken by Wilson from this bed—old oysters, from two to four years old.

Even with the rule that the burden of proof is on the complainant, the evidence sustains me in declaring that the defendants must be charged with the eight full cargoes, and the eleven half cargoes which are above designated. The evidence compels me to believe that there were more that they should be charged with, but it is not sufficiently specific to enable me to point out and specify what cargoes or what part of them they should be charged with. The rule of equity may be, that when any one is left in possession of common property, as Wilson was in this case, and without right or authority disposes of it for his own benefit, and keeps no account, or renders none, the presumption should be against him, and he should be made to account for all that it appears probable that he had taken, and should be compelled to rebut the probable proof. But I am not willing to apply the rule to B. and W. Decker, the surviving defendants, and the responsible defendants in this case, who, I am satisfied, were not aware of any misconduct of Wilson towards the complainant, or that he was clandestinely shipping oysters of Ruckman to them as his own, or oysters bought with their money. The presumption is very strong that he was faithless both to Ruckman and the Deckers. I am willing to take the responsive answer of B. and W. Decker, denying such knowledge, as conclusive, and not overcome by the evidence of Ruckman. I do not consider the rule in this case as changed by the decision in Bent v. Smith, as, whatever may be the change established by that decision, Ruckman did not go through the formality of producing a written notice, or copy of a notice written by him, to constitute the other evidence required by the rule as claimed to be modified by that decision. But I do not think that the decision in that case was intended to change the rule so as to render two facts sworn to by one witness equivalent, in overcoming an answer, to two witnesses, or the evidence of more than one witness, as required by the rule formerly acted on. This want of knowledge, though no de-

fence to the action, places them before the court in a position somewhat different from that of Wilson, or any other person who intentionally and fraudulently appropriates the property of another. The leaning of courts is always against the fraudulent wrong-doer.

The wrong done to the complainant was delivering his oysters, without his knowledge or consent, to the new firm of which Wilson was a member. Wilson, if the partnership with Ruckman continued, had no power to sell, but only to send them to New York to Ruckman for sale; if it was at an end, as it was after 1857, he had no right to dispose of Ruckman's half in any way. The only recompense Ruckman is entitled to is the value of the oysters at the time they were so misappropriated. By bringing this suit for account he waives the tort and is entitled to the same amount as if the oysters had been then sold by his authority. He has no right to follow them into the new firm and ask for an account of their profits out of them. An account must be taken of the value of these cargoes at the Wilson bed, delivered on vessels for transport to New York, as these were delivered, and at the time when they were respectively delivered. The quantity in each cargo must be taken as before stated, unless it shall be shown to the master that the quantity in any cargo was different.

No allowance can be made for the use of these flats in front of the farm, for the reason that it does not appear that the complainant had any title to the flats, or that, by the law of Virginia, a riparian proprietor has an exclusive right to the flats in front of his land, except so far as he has oysters planted on them, and then only so long as he maintains the beds. No allowance can be made for the boats and other implements used in the oyster business, furnished to Wilson by the complainant, because there is no proof that they ever came to the possession of the new firm or have been appropriated to its use. If Wilson sold them and kept the proceeds, he alone, and not the new firm, is responsible.